UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/8/2021__
```

--------------------------------------------------------------------X
                                           :

ANTHONY CORTESE, JAMES KEARNEY, DANIEL   :
JULIO, JOHN SICILIANO, JEFFREY BROOK, and   :
MARK LEYBLE, individually and on behalf of others  :
similarly situated,                                   :            20-cv-1632 (LJL)
                                           :
                      Plaintiffs,          :             ORDER
                                           :

          -v-                                  :

SKANSKA KOCH, INC., KIEWIT                   :
INFRASTRUCTURE CO., and SKANSKA KOCH –   :
KIEWIT JV,                                       :
                                         :
                    Defendants.       :
--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiffs Anthony Cortese ("Cortese"), James Kearney ("Kearney"), Daniel Julio ("Julio"), John Siciliano ("Siciliano"), Jeffrey Brooks ("Brooks"), and Mark Leyble ("Leyble") (collectively, "Plaintiffs"), bring this action on behalf of themselves and others similarly situated under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, ("FLSA") and the New York Labor Law, N.Y. Lab. L. § 650, *et seq.*, (the "NYLL") against Defendants Skanska Koch, Inc. ("Skanska Koch"), Kiewit Infrastructure Co. ("Kiewit"), and Skanska Koch-Kiewit JV ("SKKJV," and collectively with Skanska Koch and Kiewit, "Defendants"). Defendants move to dismiss the third amended complaint, Dkt. No. 60 ("TAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. Dkt. No. 72. Plaintiffs move for conditional certification of a collective action under FLSA. Dkt. No. 65. The motion to dismiss is granted with prejudice. Because the TAC is being dismissed, the move for conditional certification is denied.

## FACTUAL BACKGROUND

This case arises out of work performed in connection with the Bayonne Bridge "Raise the Roadway Plan" construction project ("Bayonne Bridge Project"), connecting Bayonne, New Jersey with Staten Island, New York.  TAC ¶ 1.  Pursuant to a 2013 contract (the "Construction Agreement") with the Port Authority of New York and New Jersey ("PANYNJ"), Defendants agreed to serve jointly as the general contractors for the Bayonne Bridge Project.  *Id*. ¶ 21. SKKJV allegedly is a joint venture between Skanska Koch and Kiewit formed for purposes of the Bayonne Bridge Project.  TAC ¶ 6.  Plaintiffs allege that Skanska Koch, Kiewit, and SKKJV constitute "joint employers" under FLSA and the NYLL because they "have an arrangement to share Plaintiffs' services, act directly in the interest of each other on the Project and/or shared control of Plaintiffs and other similarly situated employees because Defendants are jointly responsible for completion of the Project as PANYNJ's general contractor."  *Id*. ¶ 16.

Plaintiffs are all members of New Jersey-based unions who were employed by SKKJV on the Bayonne Bridge Project.  SKKJV is a party to collective bargaining agreements ("CBAs") with the employees' respective New Jersey unions.  Plaintiff Cortese, who worked as a crane operator on the Bayonne Bridge Project for five months beginning in August 2015, *id.* ¶ 45, is a member of the International Union of Operating Engineers, Local 825 ("Local 825").  *Id*. ¶¶ 26-27.  The remaining Plaintiffs—Kearney, Julio, Siciliano, Brooks, and Leyble—were all iron workers and members of the Iron Workers Local Union No. 11.  *Id*. ¶¶ 28-38.  These Plaintiffs (the "Iron Worker Plaintiffs") also worked on the Bayonne Bridge Project.  *Id*. ¶ 42.

Kearney, Julio, Siciliano, and Brooks were employed on the Bayonne Bridge Project from October 2014 to February 2019.  *Id.* ¶¶ 28-36.  Leyble was employed on the Bayonne Bridge Project from May 2014 through September 2018.  *Id*. ¶ 37.

Plaintiffs' pay is addressed both by the CBAs negotiated by their respective unions with the employer and by the Construction Agreement agreed to by the employers with the PANYNJ. The CBAs provide a wage schedule for those employed with the union.  *See* Dkt. No. 75-2 at 16-22.  The Construction Agreement also provides a wage term, stating that all "workmen, laborers and mechanics" must be paid "at least the prevailing rate of wage and supplements for others engaged in the same trade or occupation in the locality in which the Work is being performed as determined by the Engineer." *Id*. ¶ 22.  The Construction Agreement further provides "that the prevailing rates of wage and supplements are those established by the Secretary of Labor of the United States pursuant to the Davis-Bacon Act (40 U.S.C.A. 276a) for the locality in which the Work is to be performed." *Id*. ¶ 23.  The Construction Agreement goes on to recite that the prevailing wage provision was intended "for the benefit of such workmen, laborers and mechanics" and that "such workman, laborer or mechanic shall have a direct right of action against the Contractor or such subcontractor for the difference between the wages and supplements actually paid or provided and those to which he is entitled under this clause." *Id*. ¶¶ 24.

The Bayonne Bridge spans New York and New Jersey.  Plaintiffs allege that they, and other members of New Jersey-based unions, performed work on both the New Jersey and New York City sides of the Bayonne Bridge span while employed on the Bayonne Bridge Project.  *Id*. ¶ 44.  Plaintiffs allege that Defendants had a policy or practice of permitting or directing New Jersey union employees to work on the New York City side of the Bayonne Bridge span, as well as a policy of directing New York union employees to work on the New Jersey side.  *Id*. ¶ 40. New Jersey employees were paid New Jersey prevailing wages for that work regardless whether they were working on the New York side of the Bridge or the New Jersey side.  *Id*. ¶ 42.  By

contrast, New York union employees were paid New York City prevailing wages for all work, whether performed on the New York side or the New Jersey side.  *Id.* ¶ 41.

According to Plaintiffs, they were compensated at one and a half times the New Jersey rate for overtime work on the Bayonne Bridge Project.  *Id.* ¶¶ 43, 48-57.  Plaintiffs claim that SSKJV's failure to pay them at one and a half times either (i) the Davis-Bacon prevailing wage rate for Richmond County, New York or (ii) the New York City prevailing wage that was being paid to New York union member employees for the same work on the New York side of the Bayonne Bridge span violates the terms of the Construction Agreement and therefore also the overtime provisions of FLSA which, they allege, entitled them to overtime pay based on the contractual provisions.  *Id.* ¶¶ 168-69.  They also claim that the same conduct violates the NYLL and constitutes a breach of contract.

Plaintiff Cortese additionally claims that Defendants failed to pay him and other members of the Local 825 contractually required wages due for working irregular shifts.  *Id.* ¶ 192.  Cortese argues that this failure violated the NYLL's requirements that employers pay their employees in a timely fashion and that employers furnish their employees with wage statements explaining how the wages were computed.  *Id.* ¶¶ 193, 197.

The TAC asserts claims for (1) FLSA overtime; (2) NYLL overtime; (3) NYLL failure to pay wages; (4) NYLL Article 6 wage statement claims; (5) breach of contract as intended third-party beneficiaries of the Construction Agreement; (6) NYLL failure to pay wages in accordance with Local 825's CBA; and (7) violations of Article 6 of the NYLL, requiring employers to provide employees with wage statements.

## PROCEDURAL HISTORY

Plaintiff Cortese commenced this action on February 25, 2020 by filing a putative

collective action and class action complaint against Defendants.  Dkt. No. 1.  Cortese made

allegations similar to those in the TAC on behalf of a putative collective of all current and former

individual New Jersey union members employed on the Bayonne Bridge Project who were

denied payment of one and half times the New York City prevailing wage rate for all hours over

forty (40) per week for work performed on the New York City side of the Bayonne Bridge span.

*Id.* ¶ 47.  Pursuant to Federal Rule of Civil Procedure 23, Cortese sought to represent a class of

"all labor foremen and general laborers who are or were formerly employed by Defendants  on

the Project from its commencement through the entry of final judgment in this case . . . who (i)

were not paid New York City prevailing wage rates for all hours worked on the New York City

side of the Bayonne Bridge span . . ., and (ii) were Local 825 members that were not paid the

higher irregular shift differential of any trade or union member with whom the Local 825

members worked an irregular shift."  *Id*. ¶ 50.

On May 21, 2020, Cortese filed an amended complaint in light of certain rulings by the

Honorable Jed S. Rakoff in a related matter, *Cortese v. Skanska Koch, Inc.*, 2020 WL 2748438

(S.D.N.Y. May 26, 2020).  Dkt. No. 22.  On July 16, 2020, Cortese filed a second amended

complaint.  Dkt. No. 30.  Defendants moved to dismiss the second amended complaint on

August 13, 2020.  Dkt. No. 43.  On September 10, 2020, the parties stipulated to a schedule for

Cortese to move for leave to file a third amended complaint and also stipulated to stay the

briefing schedule for the motion to dismiss the second amended complaint and a then-pending

motion for conditional certification of a FLSA collective action.  Dkt. No. 51.

On September 24, 2020, Cortese filed a motion to file a third amended complaint, adding

as Plaintiffs individuals who were members of the Iron Workers Local Union No. 11 based in

New Jersey.  Dkt. No. 52.  Defendants opposed the motion on October 12, 2020, Dkt. No. 55,

and Cortese submitted a reply brief on October 15, 2020, Dkt. No. 56.  On October 22, 2020, the Court granted the motion to amend and also dismissed without prejudice the motion to certify the FLSA collective action and the motion to dismiss the second amended complaint.  Dkt. No. 58. The TAC was filed on October 23, 2020.  Dkt. No. 60.

Defendants filed this motion to dismiss the TAC on November 5, 2020, Dkt. No. 72, and Plaintiffs filed their motion in opposition on November 20, 2020, Dkt. No. 76.  Defendants submitted a reply on December 7, 2020.  Dkt. No. 80.  Meanwhile, on November 5, 2020, Plaintiffs moved for conditional certification of a FLSA collective action in connection with the TAC.  Dkt. No. 64.  The opposition brief was filed on November 20, 2020, Dkt. No. 77, and Plaintiffs filed a reply brief in further support of the motion to certify a FLSA collective action on December 7, 2020,  Dkt. No. 78.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.  Put another

way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that

discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also*

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendants move to dismiss on the following grounds: (1) the wage and overtime claims

asserted in Counts One through Five are preempted by the National Labor Relations Act, 29

U.S.C. § 151, *et seq.* ("NLRA"), under *San Diego Bldg. Trades Council Millmen's Union Loc.*

*2020 v. Garmon*, 359 U.S. 236 (1959); (2) Plaintiffs' claim for overtime pay based on what they

assert they were owed under the Construction Agreement, rather than what they were actually

paid, and the related claims for failure to keep records fail to state a claim under FLSA; (3)

Plaintiffs fail to plead sufficient facts to allege a claim for overtime violations under FLSA and

NYLL consistent with the standards set forth by the Supreme Court in *Twombly* and *Iqbal*; (4)

the claims for overtime violations pursuant to FLSA are barred, in whole or in part, by the statute

of limitations; (5) Counts Six and Seven of the TAC are preempted by the Labor Management

Relations Act of 1947, 29 U.S.C. § 141, *et seq.* ("LMRA"); and (6) independently of the

preemption arguments above, Plaintiffs' NYLL Article 6 claims (i.e., Counts Four and Seven) do

not allege a violation of law.[1]   The Court discusses the arguments in turn.

A.   <u>*Garmon* Preemption</u>

The doctrine of *Garmon* preemption was developed to protect the exclusive jurisdiction

of the National Labor Relations Board ("NLRB") over claims that are at least arguably covered

by Section 7 of the NLRA or prohibited as an unfair labor practice under Section 8 of the NLRA.

*See Bldg. Trades Emps' Educ. Ass'n v. McGowan*, 2001 WL 682740, at *3 (S.D.N.Y. June 18,

---

[1] In light of the Court's disposition of the other issues, the Court does not address these arguments.

2001), *rev'd on other grounds*, 311 F.3d 501 (2d Cir. 2002); *see also* 29 U.S.C. § 160(a).   The

Supreme Court in *Garmon* and related cases construed the NLRA to reflect a congressional

intention to delegate to the NLRB "[t]he comprehensive regulation of industrial relations,"

*Garmon*, 359 U.S. at 239, which could provide "centralized administration of specially designed

procedures . . . necessary to obtain uniform application of [Congress's] substantive rules," *id.* at

242-43 (quoting *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776 (A.F.L.)*, 346

U.S. 485, 490-91 (1953)).  Accordingly, the Supreme Court held in *Garmon* that states do not

have jurisdiction to regulate conduct arguably subject to Sections 7 and 8 of the NLRA.  *Id.* at

242.  The exercise of jurisdiction by "two law-enforcing authorities" would give rise to

"potential conflict" and "the disharmonies inherent in two systems, one federal the other state, of

inconsistent standards of substantive law and differing remedial schemes."  *Id*.  The Supreme

Court ruled "[w]hen it is clear or may fairly be assumed that the activities which a State purports

to regulate are protected by Section 7 of the National Labor Relations Act, or constitute an unfair

labor practice under Section 8, due regard for the federal enactment requires that state

jurisdiction must yield."  *Id*. at 244.  Moreover, "[w]hen an activity is arguably subject to Section

7 or Section 8 of the Act, the States as well as the federal courts must defer to the exclusive

competence of the National Labor Relations Board if the danger of state interference with

national policy is to be averted."  *Id*. at 245.  "The touchstone of preemption under [the *Garmon*]

doctrine is the potential for conflict—'potential conflict of rules of law, of remedy, and of

administration.'"  *Barbieri v. United Techs. Corp.*, 771 A.2d 915, 932 (Conn. 2001) (quoting

*Garmon*, 359 U.S. at 242).

Plaintiffs' second cause of action for overtime wage violations of the NYLL, third cause

of action for failure to pay straight time wages in violation of the NYLL, fourth cause of action

for failure to furnish an accurate wage statement in violation of the NYLL, and fifth cause of

action for breach of contract are all preempted under the *Garmon* doctrine. These claims all rest

upon Plaintiffs' assertion that the Construction Agreement required SSKJV to pay them wages

and benefits at variance with the CBAs that governed the terms and conditions of their

employment, requiring the interpretation of the Construction Agreement and providing a remedy

for what Plaintiffs claim is a breach of the Construction Agreement. They thus would give effect

to what is, at least, an arguable violation of the NLRA, which would interfere with the NLRB's

exclusive jurisdiction over labor relations.

Under Section (8)(a)(5) of the NLRA, it is an unfair labor practice for an employer to

refuse to bargain collectively with the representative of the employees' union. 29 U.S.C.

§ 158(a)(5). Once a union has been certified by the NLRB or voluntarily accepted by the

employer as the representative of employees in a bargaining unit, "only the union may contract

the employee's terms and conditions of employment." *NLRB v. Allis-Chalmers Mfg. Co.*, 388

U.S. 175, 180 (1967). "It is a violation of the essential principle of collective bargaining and an

infringement of the Act for the employer to disregard the bargaining representative by

negotiating with individual employees, whether a majority or a minority, with respect to wages,

hours and working conditions," for "[b]argaining carried on by an employer directly with the

employees, whether a minority or majority, who have not revoked their designation of a

bargaining agent, would be subversive of the mode of collective bargaining which the statute has

ordained." *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684 (1944); *see also Allis-*

*Chalmers*, 388 U.S. at 180 (holding that, once a union has been selected as a collective

bargaining representative, the NLRA "extinguishes the individual employee's power to order his

own relations with his employer and creates a power vested in the chosen representative to act in

the interest of all employees"); *Caldwell v. Am. Basketball Ass'n, Inc.*, 66 F.3d 523, 528 (2d Cir. 1995) (same).  It also is an unfair labor practice for an employer, without bargaining with the union representative, to unilaterally institute changes regarding matters which are the subjects of mandatory bargaining under the NLRA.  *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198-99 (1991) ("[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment."); *see also NLRB v. Katz*, 369 U.S. 736, 743 (1962) ("[A]n employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.").

Plaintiffs' state statutory and common law claims would enforce as contractual obligations the terms and conditions of employment—the acceptance of which would, at least arguably, constitute an unfair labor practice.  It is undisputed that the Construction Agreement was negotiated and signed by Defendants and the PANYNJ without the involvement of the collective bargaining representative.  Its terms, if given effect with respect to the employees in the collective bargaining unit, would be imposed unilaterally without any bargaining with the union representative.  It is also undisputed that the Construction Agreement contains terms and conditions of employment—indeed, that is the very nub of Plaintiffs' claim.  Defendants could not have negotiated the Construction Agreement directly with Plaintiffs, while bypassing their union representatives without at least arguably violating Section 8.  As Plaintiffs themselves admitted at argument and in supplemental briefing, it is immaterial that the benefits they seek to enforce were conferred unilaterally on them as third-party beneficiaries of a contact adopted by Defendants and PANYNJ, without union involvement.  Hr'g Tr. at 34:24-35:1; Dkt. No. 88 at 3. New York law cannot, without being preempted, confer on Plaintiffs the right to enforce a

contract term, the receipt of which would constitute an unfair labor practice.  To so hold would give every unionized company subject to New York law the right to form an enforceable agreement with every employee in the bargaining unit outside the presence of the authorized representative, rendering illusory what is "the essential principle of collective bargaining." *Medo Photo Supply*, 321 U.S. at 684.

The Connecticut Supreme Court considered a closely analogous case in *Barbieri v. United Technologies Corporation*, 771 A.2d 915 (Conn. 2001).  Its analysis is persuasive. There, the plaintiffs—a group of employees of the defendant—had previously been compensated with a salary, but were given the option of either terminating their employment or accepting a demotion to hourly positions covered by a collective bargaining agreement as part of a company-wide restructuring.  *Id.* at 920.  The employees were offered a temporary supplemental wage payment over the maximum wage set forth in the collective bargaining agreement covering hourly positions, should they be willing to accept the demotion and to remain at the company. *Id*.  During the course of negotiations, however, the union challenged the wage supplements, contending that the policy favored union members who had been demoted from salaried positions over the rest of the union membership.  *Id*. at 920-21.  As a result, the defendant agreed to discontinue the wage supplement policy and reduced plaintiffs' wages to the maximum rate for the labor grades to which they had been assigned.  *Id*. at 921.  Plaintiffs sued for breach of contract.

The Connecticut Supreme Court determined that plaintiffs' claims were preempted under *Garmon*.  According to the court, the claims at least arguably alleged violations of Section 7 and Section 8 of the NLRA, for at least two reasons.  *Id*. at 933.  First, "an employer who bypasses a union and deals directly with employees in a bargaining unit violates the National Labor

Relations Act." *Id*. at 735.  Second, "an employer violates its duty to bargain collectively when it unilaterally changes terms and conditions of employment without first bargaining with the exclusive collective bargaining representative of its employees." *Id*. at 735-36.  The court concluded: "if we were to enforce the alleged contracts herein, by imposing liability on the defendant for breaching those contracts, we would run the risk of placing our imprimatur on conduct that, at least *arguably*, violates §§ 7 or 8 of the National Labor Relations Act. . . . [E]nforcing the terms of the contracts through an award of damages would condone conduct that may otherwise be contrary to federal labor policy." *Id*. at 740.

If the plaintiffs' claims in *Barbieri* were based on conduct that arguably violated the NLRA, it necessarily follows that Plaintiffs' claims here are based on conduct that also arguably violates it.  Plaintiffs seek a benefit that the Construction Agreement sought to give them and to which they claim entitlement.  That benefit is greater than what was provided in the CBA.  But the CBA is the byproduct of processes intended to protect all employees, as a matter of congressionally-adopted national labor relations policy.  That policy entrusts to the union, once it is formed, the authority to negotiate wages, hours, and working conditions, and eliminates the power of the individual employee to negotiate those terms.  *See Allis-Chalmers*, 388 U.S. at 180. Thus, although enforcement of the Construction Agreement through Plaintiffs' state law causes of action would provide an immediate advantage to Plaintiffs, it would do so only through the type of state interference with national labor relations expressly proscribed by the *Garmon* doctrine.

Plaintiffs offer several contrary arguments, none of which is convincing.  First, Plaintiffs argue that their claims are not preempted because they assert rights independent of the CBAs. They rely on the Supreme Court's decision in *Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)

for the proposition that when an employee seeks to enforce an obligation independent of a collective bargaining agreement, the enforcement action falls outside the scope of *Garmon* preemption.  Dkt. No. 76 at 12.  Plaintiffs cite the Supreme Court's language that "a plaintiff covered by a collective bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement."  *Caterpillar*, 482 U.S. at 396.

*Caterpillar*'s holding was more modest than Plaintiffs claim.  The case concerned employees who, while employed in managerial positions not covered by a collective bargaining agreement, allegedly were promised that Caterpillar would employ them at other facilities if the plant at which they were employed ever closed.  Subsequently, however, they were demoted to union positions.  *Id*. at 389.  When the plant closed, the plaintiffs were laid off.  Plaintiffs sued under California state law, alleging breach of contract, and Caterpillar removed to federal court, arguing that any individual employment contracts made with the plaintiffs "were, as a matter of federal substantive labor law, merged into and superseded by the . . . collective bargaining agreements."  *Id*. at 390.  The question before the Supreme Court was whether the case could be removed to federal court in the first place, as the plaintiffs brought only state law claims.  Relying on the well-pleaded complaint rule, the Supreme Court held that a defendant could remove a state law claim to federal court only when "a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Id*. at 392; *see also*, *id.* at 398-99 ("[T]he plaintiff is the master of the complaint.").

The Supreme Court in *Caterpillar* did not address the substantive scope of the *Garmon* doctrine.  It rested its decision on the conclusion that "respondents' state-law claims might be pre-empted by the NLRA, but they would not be transformed into claims arising under federal

law." *Id.*  It explicitly reserved the question "whether enforcement of the individual employment contracts would constitute an unfair labor practice under the NLRA, and [would] therefore be preempted." *Id*. at 399.  Indeed, the Supreme Court noted that Caterpillar had claimed that the individual employment contracts at issue had been negotiated with the employees while they were covered by a collective bargaining agreement and that "it is an unfair labor practice 'for the employer to disregard the bargaining representative by negotiating with individual employees, whether a majority or a minority, with respect to wages, hours, and working conditions.'" *Id*. at 398 n.12 (quoting *Medo Photo Supply*, 321 U.S. at 684).  That question, and whether the claims would be preempted, would be addressed by the state courts, which had the equivalent authority and responsibility to address *Garmon* preemption and to dismiss the claims if they were based on conduct that was regulated by the NLRA.

The conduct that the Supreme Court in *Caterpillar* noted would constitute an unfair labor practice and would be the subject of *Garmon* preemption is precisely analogous to the conduct alleged here.  The employer disregarded the bargaining representative and adopted wages and working conditions that benefitted individual employees without the involvement of that representative.  Accordingly, *Carpenter* does not assist Plaintiffs' argument here but undermines it.

Second, Plaintiffs argue that the claims are not preempted because the Construction Agreement is a project labor agreement that is exempted from *Garmon* preemption.  In *Building & Construction Trades Council of Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993) ("*Boston Harbor*"), the Supreme Court considered whether a Massachusetts state entity engaged in conduct prohibited to states under *Garmon* when it enforced the terms of a prehire project labor agreement ("PLA")

negotiated and entered into by the state agency's project manager and the union for a project to remediate pollution in Boston Harbor.  The PLA required all employees working on the project to become union members and recognized the union as the exclusive bargaining agent for all craft employees.  In connection with its negotiation, the state agency adopted a bid specification requiring each successful bidder and any and all levels of subcontractors, as a condition of being awarded a contract or subcontract for work on the project to abide by the provisions of the PLA. An organization representing non-union construction-industry employers brought suit to enjoin enforcement of the bid specification, claiming, among other things, that its enforcement by the state constituted impermissible regulation of labor relations in violation of *Garmon*.  The Supreme Court rejected that argument.  A private party would have been permitted to adopt the bid specification consistent with the NLRA.  *Id.* at 230.  The Supreme Court thus held that "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, [it] w[ould] not infer . . . a restriction" on the state engaging in similar conduct.  *Id.* at 231-32.

*Boston Harbor* provides Plaintiffs no support in this case.  As Defendants here note and as the Supreme Court repeatedly emphasized, the PLA in *Boston Harbor* was a collective bargaining agreement.  *Id.* at 230; Dkt. No. 80 at 2-3.  It was negotiated between the union and the project manager.  That is what made the agreement lawful under the NLRA.  *See Boston Harbor*, 507 U.S. at 230 ("Section 8(f) [of the NLRA] explicitly permits employers in the construction industry—but not other employers—to enter into prehire agreements.  Prehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any

employees.").  In this case, by contrast, Plaintiffs seek to enforce an agreement that was imposed unilaterally by PANYNJ and Defendants on the employees and without the participation of the union representative.

Thus, as Defendants argue, Plaintiffs cannot have it both ways.  If, as Plaintiffs at times seem to argue, the Construction Agreement here could be construed to be a collective bargaining agreement and therefore not arguably in violation of the NLRA and giving rise to *Garmon* preemption, then Plaintiffs cannot enforce that agreement directly in federal court and without exhaustion under the terms of LMRA (as further elaborated below).  The union cannot simply be disregarded.  If, on the other hand, the PLA is not a collective bargaining agreement but was imposed on the union employees without the participation of their union representatives, then the conduct in adopting the Construction Agreement and in enforcing it is arguably an unfair labor practice and covered by *Garmon* preemption.  Either way, Plaintiffs lose.  Their remedy lies elsewhere—with the union if the Construction Agreement is a collective bargaining agreement and with the NLRB if it is not.  They cannot avail themselves of state statutory or common law without running afoul of one of the principles of labor law preemption, either *Garmon* preemption or LMRA preemption.[2]

Third, Plaintiffs argue that the provisions of the Construction Agreement should be considered tantamount to state regulations not preempted by the NLRA because they were negotiated by PANYNJ.  That argument too is mistaken.  The Supreme Court has held that the NLRA does not preempt state substantive labor standards of general applicability.  *See Fort*

---

[2] Indeed, Plaintiffs note that Article VI(G) of the Local 825 CBA provides that "No Project Labor Agreement (PLA) may supersede this Agreement or any of its provisions or articles without the mutual consent of the parties.  Further adding that a representative of the Employer Association may participate in any Project Labor Agreement (PLA) negotiations."  Dkt. No. 57.  Reference to that agreement only reinforces that their claim is preempted under *Garmon*.

*Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1 (1987); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985); *see also Roundout Elec., Inc. v. NYS Dep't of Lab.*, 335 F.3d 162 (2d Cir. 2003) (New York's annualization regulation enacted to implement the prevailing wage statute not preempted).   "[T]he establishment of labor standards falls within the traditional police power of the State" and thus when the state acts as regulator, preemption is not to be lightly inferred. *Fort Halifax Packing Co.*, 482 U.S. at 20.   Thus, the Supreme Court has rejected preemption challenges to state laws establishing minimum labor standards that do not relate to the processes of bargaining and self-organization.   *See Fort Halifax Packing*, 482 U.S. at 23; *Metro. Life Ins.*, 471 U.S. at 753-58.

However, as the Supreme Court held in *Boston Harbor*, the NLRA distinguishes between "government as regulator and government as proprietor."   507 U.S. at 226.   When the government "owns and manages property" and, in that capacity, "interact[s] with private participants," as in this case, it is not acting as regulator.   *Id.* at 227.   The PANYNJ and Defendants were not acting as regulator any more than the authority in *Boston Harbor* engaged in the cleanup of the harbor.   They thus have no greater authority to impose wages and working conditions on the union employees than would any private employer.

Defendants also argue that Plaintiffs' first cause of action, for violation of FLSA, should be dismissed on *Garmon* preemption grounds.   However, "[t]he term 'preemption' commonly refers to a federal law's taking precedence over state law."   *Oddo v. Bimbo Bakeries USA, Inc.*, 2017 WL 2172440, at *9 n.9 (D.N.J. May 17, 2017).   Its application is a function of Article 6 of the United States Constitution, declaring the United States Constitution and the laws of the United States to be "the supreme law of the land."   U.S. Const. art. VI, cl. 2; *see Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 414-15 (2d Cir. 2002) ("The foundation of preemption doctrines is

'the Supremacy Clause, [which] invalidates state laws that interfere with, or are contrary to, federal law.'") (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)).  The FLSA, however, is a law of the United States, of equal dignity to the NLRA.  *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 86 (2d Cir. 2006) ("The doctrine [of preemption] is inapplicable to a potential conflict between two federal statutes.").  Thus, the more appropriate way of framing Defendants' argument is whether FLSA reaches the alleged conduct and whether the claim is "precluded" by the NLRA.  *See Roache v. Long Island R.R.*, 2020 WL 5594640, at *5 (E.D.N.Y. Sept. 17, 2020) (an argument "which suggests a conflict between two federal laws is more appropriately framed as one of preclusion, rather than preemption"); *Oddo*, 2017 WL 2172440, at *9 n.9 ("Courts have sometimes used a separate term, 'preclusion', to refer to the doctrine . . . [of] one federal law taking precedence over another federal law.").  The Court now turns to the question of the interaction between the NLRA and FLSA and whether FLSA reaches the conduct alleged here and whether the claim is precluded.

B.     Plaintiffs' FLSA Claim

Plaintiffs' first cause of action is based on alleged violations of FLSA's overtime rules. FLSA guarantees that employees are paid overtime compensation "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a)(1). Plaintiffs do not dispute that they were paid the appropriate overtime rate based on base pay in their CBAs.  Rather, they argue that Defendants' failure to pay them one and one-half times the base rate stated in the Construction Agreement—which they claim they were due—violates FLSA.  In effect, they seek to enforce, through FLSA, a right to pay based on the Construction Agreement rather than on their CBAs.

Plaintiffs' argument thus posits a potential conflict between the NLRA and FLSA.  Under

18

the NLRA, once a union has been accepted by the employer as the representative of employees in a bargaining unit, the union becomes the exclusive bargaining unit for all employees in the unit, regardless of the individual employees' membership in the union.  An employee claiming a breach of the collective bargaining agreement must first exhaust administrative grievance mechanisms, and the employer cannot negotiate a separate agreement to compensate the employee on terms that conflict with the collective bargaining agreement without at least arguably committing an unfair labor practices act to be adjudicated by the NLRB.  *See infra* at 22-25*; see also J.I. Case Co. v. NLRB*, 321 U.S. 332, 339 (1944) ("We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by appropriate forums under the laws of contracts applicable, and to the Labor Board if they constitute unfair labor practices.").  By contrast, under FLSA, an employee is entitled to time and half of his base pay for overtime hours worked, whatever his base pay may have been and, as a general matter, may bring those claims directly to federal court without exhausting grievance mechanisms even if the employee is a member of a bargaining unit.  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 745 (1981) ("[T]he FLSA rights petitioners seek to assert in this action are independent of the collective-bargaining process.  They devolve on petitioners as individual workers, not as members of a collective organization.").

The two statutes, which were passed at roughly the same time (1935 and 1938, respectively) as part of the country's New Deal legislation, reflect differing and potentially conflicting philosophies about how to protect the working person.  *See* James J. Brudney, *Reflections on Group Action and the Law of the Workplace Symposium: The Changing*

*Workplace*, 74 Tex. L. Rev. 1563, 1565 (1995-96).  The NLRA embraces as the industrial policy of the United States the philosophy that the plight of the working person will be best enhanced through the collective action of labor.  *See* 29 U.S.C. § 151 ("It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce . . . by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.").  Benefits provided to employees on an individual basis, on this theory, even "if individually deserved, [are] often earned at the costs of breaking down some other standard thought to be for the welfare of the group, and always create[] the suspicion of being paid at the long-range expense of the group as a whole."  *J.I. Case*, 331 U.S. at 581.  "[A]dvantages to individuals may prove as disruptive of industrial peace as disadvantages."  *Id.*  Moreover, the NLRA reflects Congress's intent that the country's industrial relations best be entrusted to, and centralized in, the NLRB, rather than being established through judicial decisions by courts in each of the country's thirteen circuits and 94 federal judicial districts.  *See Garmon*, 359 U.S. at 239, 242-43.

FLSA, by contrast, adopts the philosophy of enhancing employee welfare by statute, rather than by collectively-bargained agreement, and on an individual basis (or collective basis when the conditions for a collective action are satisfied) by enforcement through the courts.  The stated congressional purpose of FLSA was not to help organize workers, but to raise "the minimum standard of living necessary for the health, efficiency, and general well-being of workers."  29 U.S.C. § 202.  The purpose of FLSA's overtime provisions was not to help workers organize to achieve higher pay on an absolute basis but to create disincentives to a particular labor practice deemed to be deleterious to the health and well-being of workers on an

20

individual basis.  Congress's purposes in enacting the overtime provisions of FLSA were: "(1) to spread employment by placing financial pressure on the employer through the overtime pay requirement; and (2) to compensate employees for the burden of a workweek in excess of the hours fixed in the act."  *See Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944).  As an abstract matter, FLSA base pay thus may be based on the rate of pay the employer and the employee have negotiated and agreed upon.  *See Sobczak v. AWL Indus., Inc.*, 540 F. Supp. 2d 354, 357-61 (E.D.N.Y. 2007) (holding that plaintiffs could premise a FLSA claim on the rate of overtime pay they were entitled to under their contract, rather than the rate they were actually paid).  There is no requirement of exhaustion of remedies under FLSA.[3]  Because FLSA was intended to induce employers to limit the hours that their hourly employees worked, the overtime provisions are calculated at time-and-a-half the employee's base pay rate, and an employer may violate FLSA even if it pays overtime wages above the agreed rate, if the wage does not meet one and a half times the base rate.

When thus faced with two possibly conflicting federal statutes, a court must, if at all

---

[3] This case does not present the question whether, notwithstanding *Arkansas-Best Freight*, a plaintiff who is a member of a bargaining unit must exhaust his administrative remedies when his FLSA overtime pay claim is based on a disputed interpretation of a collective bargaining agreement.  Defendants here have taken the position that FLSA claims based upon a CBA may proceed without the need to exhaust the administrative remedies of the Taft-Hartley Act.  Dkt. No. 89 at 3.  There appears to be a division among district courts in this Circuit on that issue.  *Compare Sobczak*, 540 F. Supp. 2d at 359-61 (holding that a plaintiff can pursue a FLSA claim based on a claim that his base pay under a collective bargaining agreement was miscalculated without considering the exhaustion issue), *with Freeman v. River Manor Corp.*, 2019 WL 117717, at *4 (E.D.N.Y. Mar. 3, 2019) (holding that when FLSA claim is "inextricably intertwined" with an analysis of the CBA's terms of employment, the Taft-Hartley Act requires the employee to follow the CBA's grievance and arbitration procedures before bringing a claim in federal court).  Although the Third Circuit has grappled with this issue, *see Jones v. Does 1-10*, 857 F.3d 508, 512 (3d Cir. 2017); *Bell v. Se. Pa. Transp. Auth.*, 733 F.3d 490, 491 (3d Cir. 2013); *Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 266 (3d Cir. 1990), the parties here did not identify and the Court has not found a Second Circuit case directly on point.

possible, construe them "to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267 (1981).  As the Supreme Court has stated, "we are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancar*, 417 U.S. 535, 551 (1974).  A court is obligated to construe federal statutes *in pari materia* and to "construe a statute to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991); *see also Maslenjak v. United States*, 137 S. Ct. 1918, 1927 (2017) (applying the *in pari materia* canon in rejecting an interpretation of an immigration statute that would "create a profound mismatch between the requirements for naturalization on the one hand and those for denaturalization on the other").  In other words, the Court must attempt "to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hosps.*, 499 U.S. at 101.

The issue does not appear to have been addressed by the courts in the past.  However, there is a ready means to reconcile the statutes here.  The Court need not resort to principles of "preclusion."  The courts in this Circuit have held that where an employee has an enforceable contract with an employer to be paid a particular base rate, the employer cannot avoid the requirement under FLSA to pay the employee time-and-a-half of that base rate by violating the contract.  The theory is that "since an employer cannot insist on *enforcement* of contractual pay provisions to escape its FLSA obligations, the Court does not see how the employer can avoid its FLSA obligations by *breaching* its contract." *Sobczak*, 540 F. Supp. 2d at 361; *see also Cortese v. Skanska USA Inc.*, 2020 WL 2748438, at *6 (same).

In this case, by contrast, Plaintiffs' claim assumes the conclusion that the Construction

Agreement establishes a contract enforceable by both the employer and the employee and that, if Plaintiffs received only the base pay provided by their CBAs and not that specified in the Construction Agreement, Defendants would be in breach of contract. But that is the very issue committed to the NLRB. If the Construction Agreement provides either a benefit or a detriment to the employee as an individual that was not obtained as a result of a collective bargaining agreement negotiated on behalf of the employees as a participant in the collective, the contract is not enforceable. It is not an agreement and cannot establish an obligation to pay the base pay. As the Supreme Court stated in *J.I. Case*:

> We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by the appropriate forums under the laws of contract applicable, *and to the Labor Board if they constitute unfair labor practices*.

321 U.S. at 339 (emphasis added); *see also Litton Fin. Printing Div.*, 501 U.S. at 198 (holding that an employer commits an unfair labor practice when it makes a unilateral change to a term or condition of employment without first bargaining to impasse with the union); *Int'l Union, UAW v. NLRB*, 765 F.2d 175, 180 (D.C. Cir. 1985) (holding that an employer is prohibited "from altering contractual terms concerning mandatory subjects of bargaining during the life of a collective bargaining agreement without the consent of the union"). The question then, of whether the Construction Agreement is an unfair labor practice and thus is an enforceable contract at all, is remitted to the NLRB. It cannot be litigated in this case at this stage under FLSA without doing violence to, and ultimately undermining, the exclusive jurisdiction of the NLRB and the authority it was given under the NLRA to determine the country's industrial

policy when a collective bargaining agent has been certified.[4]

This result, it bears emphasis, does no harm to the principal objective of FLSA—to discourage employers from asking their employees to work overtime by requiring employers to pay time-and-a-half for overtime hours worked.  That objective will be served, regardless of whether the base pay is that set by the CBA to which the Plaintiffs here as members of the bargaining unit are bound or (assuming it is higher) the Construction Agreement of which they claim to be third-party beneficiaries.  If Defendants failed to pay Plaintiffs overtime based off of the base rate agreed in the collective bargaining agreement, Plaintiffs would—under this approach—have a direct FLSA claim against Defendants regardless of whether that base rate actually was paid.  The result, however, is essential to preserving Congress's intent that where a bargaining agent has been appointed and questions are raised as to the enforceability of an individual agreement or whether it constitutes an unfair labor practice, "courts are not primary tribunals to adjudicate such issues[;] these determinations [are to] be left in the first instance to the National Labor Relations Board."  *Garmon*, 359 U.S. at 244-45; *see also Garner*, 346 U.S. at

---

[4] Plaintiffs argue in their briefing for the first time that "labor occurring outside the geographical boundaries of the CBA is not subject to benefits payments to the union."  Dkt. No. 88 at 2.  Thus, according to Plaintiffs, the CBA did apply to work performed outside of New Jersey and there is no issue of preemption.  Defendants dispute that assertion, stating that the CBA provides for mixed crews of New York and New Jersey Ironworkers and that it expressly "addresses situations where work crosses over 'traditional work jurisdiction lines.'"  Dkt. No. 89 at 4 n.1.  Thus, according to Defendants, "the Plaintiffs' contention that the NJCBAs would not need to be consulted or interpreted for work in New York—because it is 'outside the jurisdiction of the NJCBAs'—is patently absurd."  *Id.*  Plaintiffs' claim is best understood that enforcement of the Construction Agreement would not be an unfair labor practice and would not undermine the union's rights exclusively to represent members of the unit.  Plaintiffs' argument fails for the simple reason that it was not pleaded and a party cannot amend its complaint through a brief. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (holding that a plaintiff may not amend its complaint through its opposition brief).  Even if it were properly presented and had substance, however, it would fail for precisely the reason presented in the text.  Whether the employer's unilateral offer of the terms of the Construction Agreement constitutes an unfair labor practice is for the NLRB and not for this Court in the first instance.

490-91.

The result also is not dissimilar to that reached by the Second Circuit in considering an analogous question in *Grochowski v. Phoenix Construction*, 318 F.3d 80 (2d Cir. 2003).  The plaintiffs in *Grochowski* were construction workers employed on federally funded projects. Under the Davis-Bacon Act, 40 U.S.C. § 276a, *et seq*. ("DBA") and their contract, they were entitled to be paid not less than the prevailing wage in the locality where the work was performed.  They claimed that they were not paid the wages due them under the DBA and that they should have been paid overtime calculated at time-and-a half the prevailing hourly rates under the DBA rather than time-and-a-half the hourly rates the plaintiffs were actually paid.  The Second Circuit rejected that claim.  It noted that "[u]nder the DBA, an aggrieved employee is limited to those administrative mechanisms set forth in the text of the statute," and that plaintiffs' attempt to use the FLSA to enforce their right to DBA wages would "circumvent the procedural requirements of the DBA."  318 F.3d at 87.  It thus held plaintiffs were entitled only to time-and-a-half "the hourly rate *actually paid* the employee for the normal, non-overtime workweek for which he is employed."  *Id.* (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 365 U.S. 419, 424 (1945)).

Plaintiffs' claim here raises similar concerns to those in *Grochowski*, albeit in a different context.  If in *Grochowski*, it was necessary to read the FLSA to yield to the DBA in connection with the base rate against which to measure overtime pay in order to preserve the exclusive administrative remedy, so too here, even assuming that the "regular rate" under the FLSA could include rates promised but not paid where there is an enforceable contract.  FLSA cannot be read to entrust to this Court the final determination of whether enforcement of the Construction Agreement would be an unfair labor practice without doing violence to and undermining the

jurisdiction granted the NLRB under the NLRA.  Recognizing a FLSA overtime claim based upon the prevailing rates under the DBA would interfere with the jurisdiction of the NLRB to create a uniform set of rules governing labor relations, just as would the recognition of state statutory or contract claims based upon the DBA rates.

### C.    Failure to State a Claim under FLSA and the NYLL

Under Second Circuit law, plaintiffs alleging FLSA and NYLL overtime violations are required to allege facts in support of their claim and not just conclusions.  "In order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013); *see also Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71 (2d Cir. 2019) (same).[5]  The rule is, in part, a function of the fact that FLSA (unlike NYLL) does not provide relief for so-called "gap-time hours," i.e., unpaid hours below the 40-hour threshold, as long as the average hourly wage does not fall below the federal minimum wage.  *Lundy*, 711 F.3d at 117.  Plaintiffs are required plausibly to allege facts establishing that they worked longer than 40 hours in a week and that the time for which they claim they were underpaid is actually overtime under FLSA and NYLL.  *Id*.  The rule also is a function of the general pleading rule under *Iqbal* that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a claim.  *Iqbal*,

---

[5] Contrary to the arguments of the parties, *Lundy* does not require a plaintiff to specify in a complaint the precise number of overtime hours he worked as long as he pleads facts that plausibly established that he did work more than 40 hours in a day.  711 F.3d at 114 ("[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."); *see also Neil v. Sidney W. Barbanel Consulting Eng'r LLC*, 2014 WL 3907909, at *3 (E.D.N.Y. Aug. 11, 2014) (holding that a plaintiff is "not required to keep perfect time records or the plead its hours worked with mathematical precision.").

556 U.S. at 678.

Plaintiffs' pleading falls short of these standards.  The TAC alleges, in rote form and with respect to each of the Iron Worker Plaintiffs (save one) that, from the time of the Plaintiffs' commencement of employment to its conclusion, such Plaintiffs "regularly and primarily performed work, including straight time and overtime, on the New York City side of the Bayonne Bridge."  Dkt. No. 60 ¶¶ 50 (Julio), 52 (Siciliano), 54 (Brooks), 56 (Leyble); *see also id*. ¶¶ 45 ("Cortese performed work, including straight time and overtime, on the New York City side of the Bayonne Bridge."); *id.* ¶ 48 ("Kearney regularly performed work, including straight time and overtime, on the New York City side of the Bayonne Bridge.").  The TAC also alleges that the Iron Worker Plaintiffs "worked on both the New Jersey and New York City sides of the Bayonne Bridge span, but if they worked on the New York City side of the Bayonne Bridge span, they were only paid at least equal to New Jersey prevailing wages for work performed on the New York City side of the Bayonne Bridge span."  *Id*. ¶ 42.  The TAC contains no facts— only conclusions—to support the allegation that Plaintiffs worked "more than forty hours in a given week."  *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013).  It therefore does not contain the facts necessary to state a claim for relief.  *See Bonn-Wittingham*, 792 F. App'x at 71 ("[A]llegations that an employee 'regularly worked' more than forty hours per week are merely legal conclusions that constitute 'little more than a paraphrase of the statute' and cannot, standing alone, establish a plausible claim.") (quoting *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013)); *see also Serrano v. I. Hardware Distribs., Inc.*, 2015 WL 4528170, at *3 (S.D.N.Y. July 27, 2015) ("Allegations that a plaintiff 'regularly worked' more than forty hours per week are insufficient to 'nudge' a plaintiff's claims 'from

conceivable to plausible.'") (quoting *DeJesus*, 726 F.3d at 89-90).

Plaintiffs argue that *Lundy* and its progeny do not require dismissal here because those cases all involve disputes as to whether the plaintiff incurred overtime or was paid time-and-a-half for overtime.  Plaintiffs argue that it is undisputed here that they worked overtime and that they were not paid New York City rates for the overtime they worked.  *See* Hr'g Tr. at 27:10-12 (Plaintiffs' counsel: "there's really no dispute that they worked in New York.  There is no dispute that they were – worked overtime in New York.  This is a matter for discovery.").  Accordingly, they claim that they should not be held to the same rigid standard of pleading courts have required where there was a genuine dispute as to whether the hours for which plaintiffs did not receive payment at a rate of time-and-one-half was overtime or straight time.  In their view, the questions of the overtime hours worked and whether Plaintiffs were on the New York City side of the span goes to damages and not liability.  Plaintiffs assert that they should not be required to allege facts regarding hours when such information is in the possession of Defendants.

There is, of course, no one-size-fits-all pleading language that is required, or necessarily sufficient, to state a FLSA claim.  "Determining whether a plausible claim has been pled is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Lundy*, 711 F.3d at 114 (quoting *Iqbal*, 556 U.S. at 679).  But a plaintiff seeking to hold a defendant liable for a FLSA violation is required to plead some factual content.  It is not sufficient that the facts, if pleaded, would not be denied.  They must be pleaded.  Here, there are no facts alleged whatsoever to establish that the hours worked on the New York City side of the span were in excess of 40 hours per week.  The gap in Plaintiffs' pleading does not go to damages alone; without facts to support that Plaintiffs worked overtime, Plaintiffs have no

FLSA overtime claim whatsoever.

Nor is it sufficient for Plaintiffs to state that Defendants have the records.  Plaintiffs presumably know the hours they worked and whether and when they were in excess of forty hours a week.  Restaurant workers, retail clerks, and health care workers who have asserted FLSA claims have been required to plead facts regarding the hours they worked to state a claim even when their employer, and not they, have access to the records setting forth precise hours. *See, e.g.*, *Pelgrift v. 335 W. 41st Tavern Inc.*, 2017 WL 4712482, at *9 (S.D.N.Y. Sept. 28, 2017); *Serrano*, 2015 WL 4528170, at *3.  There is no reason that the construction workers here should be held to a lesser standard.

D.    <u>Statute of Limitations</u>

Defendants argue that even if Plaintiffs had stated sufficient facts to establish a FLSA claim and even if such a claim were viable based on the contract rate set forth in the Construction Agreement and not on what they were actually paid, such claims would be barred either in whole or in substantial part by the FLSA statute of limitations.  According to Defendants, the FLSA claims of Cortese and Julio are barred in whole under the statute of limitations.  The claims of the other Iron Worker Plaintiffs are substantially limited under the statute of limitations.

The statute of limitations for claims under FLSA is set forth in Section 255 of Title 29.  A plaintiff must bring a FLSA claim within "two years after the cause of action accrued . . ., except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255.  A claim under FLSA is considered to be commenced for statute of limitations purposes as to any individual plaintiff either:

(a) On the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

(b) If such written consent was not filed or if his name did not so appear on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.  The provision is the logical extension of Section 216(b) of the FLSA which provides in relevant part: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).

Thus, unless the employee "is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought," the action is not deemed to be commenced until "the subsequent date on which such written consent is filed in the court in which the action was commenced."  *D'Arpa v. Runway Towing Corp.*, 2013 WL 3010810, at *5 (E.D.N.Y. June 18, 2013) ("[T]he statute of limitations period continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form.") (quoting *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006)); *Hoffman v. Sbarro*, 982 F. Supp. 249, 260 (S.D.N.Y. 1997) (Sotomayor, J.) ("[O]nly by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled").

Cortese does not dispute that his FLSA claims are barred by the statute of limitations.  He alleges in the TAC that he began work on the Bayonne Bridge Project in August 2015 and that he worked on the project for five months thereafter, which would be until early 2016.  Dkt. No. 60 ¶¶ 26, 45-46.  He filed the first complaint in this action on February 25, 2020.  Dkt. No. 1.  Thus, even assuming that the TAC adequately pled willful violations of FLSA, his claims are time-barred.

Julio's last alleged date of employment was May 21, 2017.  Dkt. No. 60 ¶ 50.  Leyble's last date of employment was in September 2018.  *Id*. ¶ 56.  Kearney, Brooks, and Siciliano last

worked on the Bayonne Bridge Project in February 2019.  *Id*. ¶¶ 48, 52, 54.  Cortese did not move to add them to this action until September 24, 2020, and the TAC was not filed until October 23, 2020.  Dkt. Nos. 53, 60.[6]  Accordingly, absent an exception, the Iron Worker Plaintiffs would be time-barred from pursuing any claims for non-willful violations of FLSA accruing prior to October 23, 2018 and from pursuing any claims for willful violations of FLSA accruing prior to October 23, 2017.  29 U.S.C. § 255.[7]  Julio's FLSA claims, whether based on willful or non-willful conduct, are time-barred.  Leyble's FLSA claims are time-barred except to the extent they allege willful conduct.  The claims of the other Iron Worker Plaintiffs are partially barred by the statute of limitations.

Plaintiffs make two responses as to the Iron Worker Plaintiffs.  First, they allege that they commenced the action for statute of limitations purposes on February 25, 2020, because that is the date on which Cortese brought his claim individually and on behalf of a collective of persons similarly situated and their allegations relate back to the date of Cortese's complaint under Federal Rule of Civil Procedure 15(c).  Second, they argue that they have adequately pled willful violations.  The second argument is consequential because even if the claims of the Iron Worker Plaintiffs are not deemed to relate back to February 25, 2020, if Plaintiffs have adequately alleged willful violations, some of Leyble's claims would not be time-barred and the limitations period for claims of the other Iron Worker Plaintiffs (except Julio) would be extended.

_____

[6] The docket reflects that Plaintiffs attempted to file the TAC on October 22, 2020 but that it was rejected as deficient.  Dkt. No. 59.  Plaintiff "has provided no excuse for her failure to comply with the rules of this district."  *Davis v. Lenox Hill Hosp.*, 2004 WL 1926086, at *8 (S.D.N.Y. Aug. 31, 2004).  Accordingly, the correct date is no earlier than October 23, 2020.

[7] The docket does not reflect that any of the Iron Worker Plaintiffs have filed a consent to become a party plaintiff.  If that is so, the statute of limitations would continue to run for their claims.  *See Davis*, 2004 WL 192086, at *8 (holding that the date of commencement is the date on which a consent form is filed with the clerk of court).

Plaintiffs' first argument turns on the interaction between Section 255 of Title 29 and Rule 15(c) of the Federal Rules of Civil Procedure.  Rule 15(c)(1) provides:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).  "Rule 15(c) is based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading."  Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1496 (3d ed. 2021).

The allegations of the Iron Worker Plaintiffs do not relate back under Rule 15(c). FLSA's statute of limitations does not allow relation back under Rule 15(c)(1)(A).  To the contrary, FLSA explicitly contemplates a circumstance where a party plaintiff brings an action "in behalf of himself . . . and other employees similarly situated," and provides both that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  The action will not be considered to be commenced for statute of limitations purposes by any party not named in the complaint and for whom a consent was not filed until

"the subsequent date on which such written consent is filed in the court in which the action was commenced."  29 U.S.C. § 256.  Unambiguously, FLSA does not allow relation back.

The Iron Worker Plaintiffs cannot use Rule 15(c)(1)(B) or (C) to circumvent the plain intent of FLSA.  Although Rule 15(c)(1)(C), by its terms, applies only to amendments changing the name of the party "against whom a claim is asserted," Fed. R. Civ. P. 15(c)(1)(C), the Advisory Committee Note states that the "attitude taken in [that rule] toward change of defendants extends by analogy to amendments changing plaintiffs," Fed. R. Civ. P. 15(c) advisory committee's note to 1966 amendment.  Although the Second Circuit has not issued a precedential opinion setting forth the requirements for applying Rule 15(c) to an amendment seeking to add new plaintiffs, *see Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 56 (E.D.N.Y. 2015) ("[I]t is not well-settled within the Second Circuit" how to interpret Rule 15(c)(1)(C) for "amendments seeking to add plaintiffs"), it has confirmed that Rule 15(c) is "applicable to a proposed change of plaintiffs," *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir. 1997).  But that more relaxed attitude towards the adding of plaintiffs only applies "where the defendant would [not] be unfairly prejudiced in maintaining a defense against the new plaintiff, and [where] the defendant knew or should have known that it would be called on to defend against claims asserted by the new plaintiff."  James W.M. Moore, *Moore's Federal Practice* § 15.1(3)(f) (3d ed. 2020).  Neither circumstance is present in connection with a FLSA collective action where a single plaintiff brings a claim putatively on behalf of a group of similarly situated employees but those similarly situated employees do not file consent forms until months or years later.

First, Defendants here would face prejudice.  "[T]he defendant has a protectible expectation created by statute that it will face suit only from those who timely consent to opt in"

and "notice has no independent legal significance." *Huer Huang v. Shanghai City Corp.*, 2020 WL 5849099, at *14 (S.D.N.Y. Oct. 1, 2020). "[O]ne of the purposes of the FLSA is to protect employers from suits that accrue more than three years before that date." *Contrera v. Langer*, 278 F. Supp. 3d 702, 726 (S.D.N.Y. 2017). That interest would be defeated by a rule that would, in effect, stop the running of the statute of limitations for all employees considered to be similarly situated the moment any one employee files a FLSA collective action. The language of the statute would be rendered illusory. Second, there is no reason to think that Defendants knew or should have known that others would join the collective action. The law is clear. It puts the burden on each individual employee to file a consent if it wishes to join a collective action and pursue a FLSA claim. Until that date, the employer is entitled to expect (and reasonably expects) that it faces exposure only from the named plaintiff and from those who have filed consents. *See ABC Carpet & Home*, 236 F.R.D. at 199 ("Signed consents do not relate back to the original filing date of the complaint."); *Sbarro*, 982 F. Supp. at 260 (S.D.N.Y. 1997) ("[O]nly by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled.").

This conclusion, moreover, follows ineluctably from both the Rules Enabling Act and the large body of law that has developed in this Circuit regarding the tolling of the statute of limitations. The three-year period under FLSA is a statute of repose that cannot be extended by Rule. *See Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.*, 291 F. Supp. 3d 364, 371 (S.D.N.Y. 2018). A statute of repose, such as FLSA's, creates a substantive right. *See Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013). Under the Rules Enabling Act, the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). "The use of the term 'shall' in the statue's language indicates its mandatory nature; federal courts are bound by its

34

dictates." *IndyMac*, 721 F.3d at 109.  Moreover, following the language of FLSA and the Rules Enabling Act, a large body of law in this Circuit holds that a FLSA claim is not tolled by the filing of a collective action.  *See Shanghai City Corp.*, 2020 WL 5849099, at *12-14.  If Plaintiffs' argument were to be accepted and the limitations period were tolled when a single employee filed a complaint and a consent, the principle regarding tolling would be rendered irrelevant.  A new plaintiff whose claim would otherwise be time-barred would need not establish that the running of the statue was inequitable; instead, he would simply claim as a matter of rule (and not of statute) that time did not run against his claim from the filing of the first claim.  Plaintiffs have not cited a single case that would support that result.

      E.    <u>Failure to Pay for Irregular Shifts</u>

Defendants move to dismiss Counts Six and Seven of the TAC on the grounds that they are preempted by LMRA.  By Count Six of the TAC, Cortese alleges that he worked irregular shifts; that the Local 825 CBA entitled him to a higher irregular shift differential; that the shift differential was a wage within the meaning of the NYLL; and that Defendants violated Section 191 of the NYLL by failing to pay him the higher irregular shift differential for all irregular shift work performed by him.  By Count Seven, Cortese alleges that the failure to pay him the irregular shift differential compensation—and failure to include that amount in his wage statement—resulted in a violation of the New York wage statement law, Article 6 of the NYLL.

Section 301 of LMRA, 29 U.S.C. § 185(a), provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties."  The Supreme Court has "read the text of § 301 not only to grant federal courts jurisdiction over claims asserting breach of collective-bargaining agreements but

also to authorize the development of federal common-law rules of decision." *Livadas v. Bradshaw*, 512 U.S. 107, 122 (1994); *see also Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-57 (1957). In particular, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions are raised in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers*, 471 U.S. at 211.

Thus, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Id.* This doctrine serves the interests of "interpretive uniformity and predictability" in the interpretation of labor agreements and ensures that "'relationships created by [a collective-bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.'" *Id.* (quoting *Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 224-25 (1983)). It also furthers the "central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.* at 220. A rule that would permit an individual employee to circumvent the dispute resolution mechanisms frequently found in CBAs by pleading in different form what is, in essence, a claim for breach of contract, "would cause arbitration to lose most of its effectiveness" and "eviscerate" that central tenet. *Id.* Section 301 also precludes claims under the FLSA that involve interpretation of a CBA. *Johnson v. D.M. Rothman Co.*, 861 F. Supp. 2d 326, 332-333 (S.D.N.Y. 2012).

Cortese's claims are preempted by LMRA. His claim rests squarely on a right created by the CBA and would require interpretation of the CBA upon which it depends. He asserts that the

CBA entitles a person who performed irregular shift work to high irregular shift differential compensation.  TAC ¶ 193.  That claim depends on an interpretation of the meaning of "irregular shifts" as defined in the CBA, as well as conclusions regarding whether he worked with other trades or locals and whether those other trades or locals received a higher irregular shift differential for the shifts Cortese worked.  It also depends on conclusions regarding whether the shift premium was waived and whether the Department of Labor included this "irregular shift differential" in its wage rate schedules.  Dkt. No. 74 at 24.  All of these questions depend upon the interpretation of the CBA.  If Cortese had brought this claim for breach of the CBA, he therefore would have been relegated to the dispute resolution provisions of that agreement.

Cortese cannot avoid that conclusion by relying on NYLL § 191, and not the common law, to enforce that right.  Dkt. No. 60 ¶ 193.  Section 191 does not create a freestanding statutory right independent of a pre-existing contractual right.  It merely provides a vehicle by which an employee can enforce his right to be paid on a particular schedule.  *See Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 158 (2d Cir. 2012) ("A plaintiff 'cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages.'") (quoting *Tierney v. Capricorn Invs., L.P.*, 592 N.Y.S.2d 700, 703 (1st Dep't 1993)).  Here, as the TAC makes clear, the underlying right Cortese asserts is one allegedly created by the CBA.  TAC ¶ 193 ("Defendants violated NYLL § 191 by failing to timely pay to Cortese and members of the Local 825 Class the contractually required higher irregular shift differential compensation required by the Local 825 CBA for all irregular shift word performed by Cortese and members of the Local 825 Class . . .").  Thus, as the language of the TAC itself shows, Cortese's claim for relief is based squarely on a failure to pay "contractually required higher irregular shift differential compensation required by the . . . CBA."  *Id.*  It thus is

preempted.  *See Ellis v. HarperCollins Publishers, Inc.*, 2000 WL 802900, at *2 (S.D.N.Y. June

21, 2000) ("Because the reported violation of [Section 191] is based on a failure to pay union

employees *in accordance with the terms of a CBA*, . . . this violation is preempted by Section 301

of the [LMRA].").  Cortese's NYLL claim fails, as the CBA—and not the NYLL—"is the source

of the rights asserted."  *Wynn v. AC Rochester*, 273 F.3d 153, 158 (2d Cir. 2001) (quoting *Foy v.

Pratt & Whitney*, 127 F.3d at 235 (2d Cir. 1997)).

The decisions Cortese cites do not support his case.  Cortese relies on *Ramirez v.

Riverbay Corp.*, 35 F. Supp. 3d 513 (S.D.N.Y. 2014).  In *Riverbay*, plaintiffs alleged that, by

failing to include nighttime shift differentials that the plaintiffs were paid, the defendant

company had miscalculated the plaintiffs' base rate of pay for the purpose of determining the

overtime compensation plaintiffs were entitled to under FLSA and the NYLL.  The court held

that the statutory claims were not preempted.  According to Plaintiffs, *Riverbay* stands for the

proposition that "a statutory wage claim based on a wage payment differential required by a

collective bargaining agreement" is not preempted by LMRA.  Dkt. No. 76 at 25.  This

interpretation misreads the case.  *Riverbay* did not turn upon the question of whether the CBA

had been breached.  There was no "dispute about the parties' rights under the CBAs," and

accordingly, the claim turned solely upon the plaintiff's statutory right under FLSA and the

NYLL to be paid overtime at a rate not less than one and a half times the employees' regular

hourly wage.  *Riverbay*, 35 F. Supp. 3d at 523.  The court held that "th[e] claims invoke statutory

rights that are independent of the rights conferred on the parties by the CBAs."  *Id*. at 523.

Therefore, the claims were not preempted under LMRA.  Here, by contrast, Plaintiffs' claim

depends entirely upon Defendants' alleged failure to pay wages due under the terms of the CBA.

There is no independent statutory obligation on which Plaintiffs can based their claim.

This distinction was drawn clearly in *Isaacs v. Central Park System of New York, Inc.*, 2012 WL 957494, at *5 (E.D.N.Y. Feb. 27, 2012).  There, a court held that two FLSA and NYLL claims were not preempted by Section 301: plaintiff's statutory failure to pay claim alleging that he was forced to work time for which he was not paid and his overtime rate calculation claim alleging that shift differentials (as to which there was no dispute he was owed) were improperly not included in his base rate for purposes of computing his overtime pay.  The court distinguished those claims from one that would be preempted: "If plaintiff's claim requires the Court to determine whether certain shift differentials and longevity pay were required to be incorporated into Isaac's regular wages in accordance with the CBAs, the claim must be dismissed since that type of dispute is subject to contractual grievance procedures."  *Id.*  Precisely this type of claim is at issue here.

Cortese's reliance on the Supreme Court's decision in *Livadas v. Bradshaw*, 512 U.S. 107 (1994) is similarly unavailing.  In *Livadas*, the Supreme Court held that Section 301 "cannot be read broadly to preempt nonnegotiable rights conferred on individual employees as a matter of state law."  *Id.* at 123.  The Supreme Court stated that "it is the legal character of a claim, as 'independent' of rights under the collective bargaining agreement, (and not whether a grievance arising from 'precisely the same set of facts' could be pursued) that decides whether a state cause of action may go forward."  *Id.*  The Supreme Court thus held that a California law requiring all employers to pay all wages due immediately upon an employee's discharge, imposing a penalty for refusal to pay promptly, and giving the State Commissioner of Labor responsibility for enforcement, was not preempted as applied to a claim based on the refusal to pay an employee wages due under a collective bargaining agreement.  The right asserted was not a contractual right to be paid what was promised, but rather a statutory right to be paid timely the contractual

pay, whatever that pay might be.  The lawsuit thus did not depend on the interpretation of a collective bargaining agreement and did not seek to enforce a right created by a collective bargaining agreement.  "[T]he primary text for deciding whether Livadas was entitled to a penalty was not the [CBA], but a calendar" and "[t]he only issue raised by [the] claim, whether [defendant] 'willfully fail[ed] to pay' her wages promptly upon severance . . . was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer."  *Id*. at 124-25.  Because, the Supreme Court held, "liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation [was] no reason to hold the state-law claim defeated by § 301."  *Id*. at 125.[8]

This case is far different.  The underlying right that Cortese seeks to assert was created by the CBA.  His claim is not independent of the CBA.  It is entirely dependent on it.  The NYLL only provides the vehicle for him to attempt to enforce that pre-existing right.  It thus is preempted by LMRA.

F.    Dismissal with Prejudice

---

[8] The Court relied on its earlier unanimous decision in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988), holding that Illinois law providing that an employee discharged for filing a worker's compensation claim may recover compensatory and punitive damages from her employer was not preempted by Section 301 as applied to an employee who was the beneficiary of a collective bargaining agreement that also provided a remedy for discharge without just cause.  The state-law claim, the Supreme Court emphasized, turned on "purely factual questions [that] pertain[] to the conduct of the employee and the conduct and motivation of the employer" and did not "require a court to interpret any term of a collective-bargaining agreement."  *Id.* at 407.  The Supreme Court concluded: "Thus, the state-law remedy . . . is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement."  *Id.*  It reiterated, however: "judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements."  *Id.* at 411.

Federal Rule of Civil Procedure 15(a) provides that "a party may amend the party's pleading . . . by leave of the court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)."  *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).  However, "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Granting leave to amend in 'futile' if a revised claim still 'could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

Where a plaintiff's claims are clearly preempted by federal law, a court need not grant leave to amend.  *See Melendez v. ONE Brands, LLC*, 2020 WL 1283793, at *9 (E.D.N.Y. Mar. 16, 2020) (holding that, where a claim under the New York General Business Law was preempted by federal law, amendment of the complaint would be futile); *Myrieckes v. Woods*, 2009 WL 884561, at *7 (S.D.N.Y. Mar. 31, 2009) (finding that amendment would be futile where there was no way for the plaintiff to avoid preemption of his state law claims under the Copyright Act).  The same is true when a plaintiff's claims are clearly time-barred.  *See Jordan*, 91 F. Supp. 3d at 510; *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

Plaintiffs have requested that, in the event that the Court dismisses their complaint, as it

has, that the Court give them leave to amend the complaint.  Plaintiffs ask for an opportunity to replead that they worked more than forty hours a week.  As discussed above, however, even if Plaintiffs had properly alleged that they worked overtime hours, their state law claims would nonetheless be preempted by the NLRA and LMRA, and their allegations under FLSA fail as governed by the NLRA.  Thus, the Court concludes that amendment would be futile, and the case is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss with prejudice is GRANTED. The motion for conditional certification is DENIED.  The Clerk of Court is respectfully directed to close Dkt. Nos. 64 and 72 and to terminate the case.

SO ORDERED.

Dated: February 8, 2021
      New York, New York                         LEWIS J. LIMAN
                                         United States District Judge